IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE PLASTICS ADDITIVES ANTITRUST LITIGATION | : : : : | Master Docket No. 03-CV-2038-LDD and MDL Docket No. 1684 |
| THIS DOCUMENT RELATES TO: | : : | |
| *Gitto/Global Corp. v. Rohm & Haas Co., et al.*, No. 03-CV-2038 (Direct Purchaser Class Action) | : : : : | |

## PLAINTIFFS' POST-HEARING SUBMISSION

Joseph C. Kohn
William E. Hoese
Craig W. Hillwig
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3389

Robert N. Kaplan
Gregory K. Arenson
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022

J. Douglas Richards
COHEN MILSTEIN SELLERS
  & TOLL, P.L.L.C.
88 Pine Street, 14th Floor
New York, NY 10005

Solomon Cera
C. Andrew Dirksen
GOLD BENNETT CERA &
  SIDENER LLP
595 Market Street, 23rd Floor
San Francisco, CA 94105

Plaintiffs' Co-Lead Counsel

DATED: July 2, 2010

The Court's task is "to consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2009). "Plaintiffs' burden at the class certification stage is *not* to *prove* the element of antitrust impact . . . Instead, the task . . . is to demonstrate that the element of antirust impact is *capable of proof at trial* through the evidence that is common to the class." *Id.* at 311-12 (emphasis added).

## I.    WHAT A PLAINTIFF MUST PROVE TO ESTABLISH ANTITRUST IMPACT

Antitrust impact is the only element of plaintiffs' claim defendants contend does not present predominantly common issues. For an antitrust claim, a plaintiff must prove "*some . . . impact.*" *Id.* at 311 (emphasis added). "Impact is distinguished from calculation of damages which determines the actual *value* of the injury." *Id.* (emphasis added).

Impact is inherently a market-wide concept. Plaintiffs have alleged a conspiracy to fix prices in a nationwide *market*, not a conspiracy targeted at particular *individual* customers. The conspiracy evidence – which defendants admit is common to each class member – will show that defendants intended to effect prices in the *market generally*, not to selected customers.

Plaintiffs' evidence of impact for the class is the same body of evidence that any one individual (or group of individual plaintiffs) would present to prove the element of "impact" at trial. It is, therefore, common proof under Rule 23(b), which need only predominate.

## II.   THE EVIDENCE ESTABLISHES THAT IMPACT IS CAPABLE OF PROOF BY COMMON EVIDENCE AT TRIAL

Plaintiffs' impact evidence falls into the following categories:

a. Testimony and documents showing defendants' pricing practices were intended to and did affect the *market*, such as parallel pricing announcements intended to affect all customers nationwide and defendants' reports confirming price increases to all customers and that

65743

announced prices were "holding," thereby affecting the *market*. This alone is sufficient to demonstrate impact for any customer. Defendants' argument that some announcements were rescinded is a red hearing – an announcement can affect the market and cause impact even when later withdrawn. In any event, both sides' proof is common evidence.

      b.  Economic testimony concerning the structure in the market of: (i) interchangeable products, (ii) a national market, (iii) high market concentration among defendants, (iv) barriers to entry, and (v) inelastic demand, which means all customers were impacted.[1]

      c.  Pricing structure charts based on the transaction data.  Whatever the outcome of the dispute between the parties' experts, it is based on common evidence.[2]

      d.  The multiple regression analysis, a well-accepted statistical tool, as recognized by both economic experts and in *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1238 (3d Cir. 1993).

## III.  THE EXPERTS' DISPUTES CONCERNING THE REGRESSIONS ARE ONLY A QUESTION OF JUDGMENT BASED ON COMMON EVIDENCE

      *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009) is directly on point. Judge Underhill wrote with respect to the use of a regression of Dr. Beyer's – challenged by defendants – in satisfying the Rule 23(b) predominance test.

> The real question before this court is whether the plaintiffs have established a *workable* multiple regression equation, not whether plaintiffs' model actually *works* <u>because the issue at class certification is not which expert is the most credible, or the most accurate modeler, but rather have the plaintiffs demonstrated that there is a way to prove a class-wide measure of damages through generalized proof.</u>

*Id.* at 100 (original italics; underlining added).

      The *EPDM* court described defendants' argument as "asking the court to determine

---

[1] Dr. Summers had too narrow a view of substitutability: chemical identity. Defendants' contemporaneous crosswalks showed competitive products that were not chemically identical.

[2] While confirmatory, this analysis is not necessary to Dr. Beyer's conclusion of impact.

which multiple regression model is *most* accurate, which is ultimately a merits decision." *Id.* (emphasis added). Similarly here, it is not plaintiffs' burden to convince the Court that there was *in fact* antitrust impact. That is the ultimate question for the jury. Plaintiffs' burden is to show that there is a "feasible" and "workable" model, which together with their other evidence, shows that the element of impact is *capable* of common proof at trial. *Hydrogen Peroxide*, 552 F.3d at 311-12.

A regression expresses a relationship between one variable, here prices, and explanatory variables as to what affects the value of the first variable. This is called a model, because the statistics can only approximate what happens in reality. In creating a model, economists must use judgment: first, as to what explains prices (supply, demand, an explosion at a plant, customer buying power, differences among products, different package sizes), and, second, as to what data to use as a proxy for each explanation. For example, an economist rarely knows all the information that contributes to a supply curve, but may approximate supply with variable costs. But, even when using variable costs, an economist rarely knows every cost and has data for each.

Because any model only approximates reality and there is never complete information, there are statistical tests to see how good the model is: some that sound technical – R-squareds, t-statistics, F-tests – and some named after professors – Chow tests and Ramsey reset tests. But, which tests to use is also a matter of judgment, as is what to do with the results of any such test. Therefore, there must be an economic rationale for what to put in the model, what tests to run, and how to interpret them. Further, because it is a judgment call, there is not necessarily a right or wrong answer, despite an economic expert saying he would never do a particular test or never use a particular proxy for a variable.

So what does a court do as it sits in judgment on the economists' judgments? Plaintiffs

submit that, unless plaintiffs' economists' judgments are so far out of the main stream, so clearly wrong that they must be rejected, or so clearly directed at issues that are not in the case, then, under the standard for class certification, the regression is common proof "capable" of being resolved by the jury.

Here, Dr. Beyer uses market-wide regressions that demonstrate impact from the conspiracy. Mr. Kaplan incorrectly approaches from the opposite direction, using individual regressions, even though that is not how plaintiffs propose to prove their case.

Mr. Kaplan proposed an illogical tautology: to test Dr. Beyer's *market-wide* regressions, one must look at *individual* regressions; when the *individual* regressions fail (even if only for 16 out of 503 ESBO customers), then, he argues, that demonstrates there cannot be common proof through the *market-wide* regressions. The logic is obviously flawed. Dr. Beyer has presented market-wide regressions that can be used by every customer to demonstrate impact.

Even Mr. Kaplan could not run individual regressions for 388 out of 503 ESBO purchasers (77% of the subclass) or for 353 out of 508 tin purchasers (69.5% of the subclass), because of a lack of data for these customers.[3] Of the 115 individual ESBO customer regressions that Mr. Kaplan ran, 83 were misspecified (72% of the individual regressions and 16.5% of the subclass) because they had the wrong sign on the coefficients for the cost or demand variables or were not statistically significant.[4] For Mr. Kaplan's 155 individual tin customer regressions, 81 were misspecified (52% of the individual regressions and 16% of the subclass).[5] Thus, for the

---

[3] Mr. Kaplan says this is okay, because these numerous subclass members are the smaller purchasers with only 14% and 11% of purchases of the subclasses, respectively.

[4] Of the remaining 32 individual ESBO customer regressions, 16 showed a statistically significant overcharge, leaving a mere 16 regressions arguably supporting Mr. Kaplan's point of view (Dr. Beyer disagrees), of which one is unbalanced with one transaction in the conspiracy period.

[5] Of the remaining 74 individual tin customer regressions, 23 showed a statistically significant overcharge, leaving 51. Of the 51 regressions, seven may be considered unbalanced with fewer than 10 transactions in one of the two periods.

4

overwhelming majority of the subclasses – 93.5% of ESBO customers and 84.5% of tin

customers – individual regressions cannot be used. Their only alternative is Dr. Beyer's market-

wide regressions.

Mr. Kaplan claims his Chow tests show that Dr. Beyer's regressions must be split up. Dr.

Beyer says the Chow tests are preordained to come out Mr. Kaplan's way. In evaluating this

dispute, the Court should look at two things – the inferences from the non-statistical analysis and

the reason Mr. Kaplan gave for running his tests.

The non-statistical analysis demonstrates that there is common evidence of a conspiracy,

as defendants have stipulated. The conspiracy operated through parallel price announcements

and the cooperative ESBO capacity reduction between Arkema and UCC prior to the plant

explosion. There is proof of the effectiveness of these mechanisms in raising prices through

defendants' contemporaneously created documents. The statistical analysis should show this.

There is no economic reason for Mr. Kaplan's Chow tests, and there is no requirement

that they be used.

> Wal-Mart maintains that the district court erred by not requiring Dr. Drogin to
> perform a "Chow test" to determine whether data could be properly aggregated.
> We have not found a single case suggesting or requiring use of such a test.

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 608 n.32 (9th Cir. 2010).

The remaining econometric issues – the proper cost and demand variables for the tin

regression, the inclusion of capacity or capacity utilization variables, the proper way to handle

the Blooming Prairie plant explosion effects – are all judgment calls (on which Dr. Beyer was

right) that boil down to a dispute over the outcome of common proof.

## IV.   CONCLUSION

Plaintiffs have carried their burden to "satisfy" the Court that the Rule 23(b)

predominance element is met, that is, their claims are "capable" of common proof at trial.

5

DATED: July 2, 2010                          Respectfully submitted,


By: */s/ Joseph C. Kohn*
Joseph C. Kohn                               Robert N. Kaplan
William E. Hoese                             Gregory K. Arenson
Craig W. Hillwig                             KAPLAN FOX & KILSHEIMER LLP
KOHN, SWIFT & GRAF, P.C.                      850 Third Avenue, 14th Floor
One South Broad Street, Suite 2100           New York, NY 10022
Philadelphia, PA 19107-3389                  Tel: (212) 687-1980
Tel: (215) 238-1700                          Fax: (212) 687-7714
Fax: (215) 238-1968


J. Douglas Richards                          Solomon Cera
COHEN, MILSTEIN, SELLERS                      C. Andrew Dirksen
    & TOLL P.L.L.C.                           GOLD BENNETT CERA & SIDENER LLP
88 Pine Street, 14th Floor                    595 Market Street, 23rd Floor
New York, NY 10022                            San Francisco, CA 94105
Tel: (212) 838-7797                           Tel: (415) 777-2230
Fax: (212) 838-7745                           Fax: (415) 777-5189

Plaintiffs' Co-Lead Counsel

6

65743

## CERTIFICATE OF SERVICE

I , William E. Hoese hereby certify on this 2nd day of July, 2010, the foregoing Plaintiffs'

Post Hearing Submission was filed electronically with the Court's ECF system, which sends

electronic notice to the following:

**ATTORNEYS FOR ROHM & HAAS COMPANY**

John G. Harkins, Jr. <jharkins@harkinscunningham.com>
Colleen Healy Simpson <csimpson@harkinscunningham.com>

**ATTORNEYS FOR ARKEMA, INC.**

Howard D. Scher <howard.scher@bipc.com>
Steven Bizar <steven.bizar@bipc.com>

**ATTORNEYS FOR UNION CARBIDE CORPORATION**

Nathan P. Eimer <NEimer@EimerStahl.com>
Scott C. Solberg <ssolberg@EimerStahl.com>
John K. Theis <jtheis@eimerstahl.com>
James J. Rodgers < jrodgers@dilworthlaw.com>

**ATTORNEYS FOR THE DOW CHEMICAL COMPANY**

Tefft W. Smith <tsmith@kirkland.com>
Colin R. Kass <ckass@kirkland.com>
James J. Rodgers < jrodgers@dilworthlaw.com>

Dated: July 2, 2010

/s/ William E. Hoese
William E. Hoese

65739