IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE PLASTICS ADDITIVES ANTITRUST LITIGATION ) ) ) | Master Docket No. 2:03-CV-2038 |
| ) | The Honorable Legrome D. Davis |
| THIS DOCUMENT RELATES TO: ) Gitto/Global Corp. v. Rohm & Haas Co., ) *et al.*, No. 03-CV-2038 ) ) | |

## DEFENDANTS' OUTLINE OF EVIDENCE PRESENTED AT JUNE 28-30, 2010 CLASS CERTIFICATION HEARING

Howard D. Scher
Steven E. Bizar
Francis X. Taney, Jr.
Thomas P. Manning
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA 19102-2555
(215) 665-8700
(215) 665-8760 (facsimile)
*Attorneys for Defendant*
*Arkema Inc.*

John G. Harkins, Jr.
Colleen Healy Simpson
HARKINS CUNNINGHAM LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103
(215) 851-6700
(215) 851-6710 (facsimile)

*Attorneys for Defendant*
*Rohm and Haas Company*

Tefft W. Smith (admitted pro hac vice)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000
(202) 879-5200 (fax)

James J. Rodgers
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000
(215) 575-7200 (facsimile)

*Attorneys for Defendant*
*The Dow Chemical Company*

Nathan P. Eimer (admitted pro hac vice)
Scott C. Solberg (admitted pro hac vice)
John K. Theis (admitted pro hac vice)
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
(312) 660-7600
(312) 682-1718 (facsimile)

James J. Rodgers
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000
(215) 575-7200 (facsimile)
*Attorneys for Defendant*
*Union Carbide Corporation*

## I. Legal Framework under *Hydrogen Peroxide*

Class plaintiffs must prove at trial that every proposed class member suffered antitrust injury or "impact". Whether a class member, in fact, paid a higher price as a result of the conspiracy (*i.e.*, suffered impact) is a yes or no question distinct from the question of "how much" damage a class member may have suffered (*i.e.*, the calculation of damages). To obtain class certification, a plaintiff must prove by a preponderance of the evidence that a jury could determine, based only on evidence common to the class, that each and every class member suffered impact. In other words, the class representatives must show that the element of antitrust impact for each class member is "capable of proof" through common evidence. If a determination of whether each class member was injured requires individualized inquiry, then class certification must be denied.

The evidentiary hearing facilitates the Court's rigorous assessment of the available evidence and method by which plaintiffs hope to prove impact for each member of the class.

Plaintiffs presented four broad categories of available evidence they claim meets their burden: 1) Dr. Beyer's regression analyses; 2) price increase announcements and related anecdotal evidence; 3) Dr. Beyer's "Pricing Structure" analysis; and 4) Dr. Beyer's market characteristics analysis. The proffered evidence and methods, whether considered individually or collectively, are not capable of proving impact on all class members.

## II. Dr. Beyer's Regressions Are Irrelevant to Proving Impact for Every Class Member

A. Dr. Beyer admits that his regression analyses do not provide a "method" to answer the critical question of whether each class member was adversely affected by the alleged conspiracy.

> Q: And your regression models are not designed – they're not specified to test impact or the absence of impact at an individual class member level, correct?
>
> A: That's correct.
>
> (Tr. June 28, 2010 Evening Session 32: 7-10.)

B. Dr. Beyer's "industry-wide" overcharge is irrelevant to proving whether any particular class member was injured by the alleged conspiracy.

1. Dr. Beyer's single industry-wide overcharge estimate conflates the varied pricing experiences of hundreds of class members.

a) Mr. Kaplan's demonstrative graphs illustrate how when "Customer A" suffers an overcharge, but "Customer B" suffers no overcharge, a regression that merely combines these two customers can mask the "no overcharge" to Customer B. *See* D-132, D-133, D-134.

b) Dr. Beyer admits that his method necessarily has this effect:

> Q: And any single customer might have paid less, the same or more during the class period but you[r] regression models produce one industry[-]wide estimate, right?

A: Yes.

(Tr. June 28, 2010 Evening Session 43:9-12.)

2. Breaking apart Dr. Beyer's "pooled" data, and applying Dr. Beyer's regression framework to individual customers (the "disaggregated" regressions), Mr. Kaplan finds that Dr. Beyer's model shows that not all customers suffered impact and that the customers should not be included in a single regression measuring a single "effect" of the alleged conspiracy. See P-52 and P-73.

   a) The disaggregated regressions show that, controlling for the same variables and using the same data Dr. Beyer used, many customers paid significantly *lower* prices (no overcharge) during the alleged conspiracy period and many other customers' prices were not significantly different statistically between the two periods (no overcharge).

   b) Plaintiffs' cataloging of the customer-specific regressions that do not bear the "correct signs" anticipated by Dr. Beyer (P-52a, P-73a) *further* demonstrates that Dr. Beyer's single industry-wide overcharge should not be applied to each and every class member. (*See* Mr. Kaplan's Cross-Examination.)

3. Mr. Kaplan's application of the Chow Test independently confirms that Dr. Beyer's pooled regression misrepresents actual customer experiences.

   a) The Chow Test is a standard, well-accepted statistical test designed to determine whether a regression that "pools" data across categories or customers accurately models reality, as compared to a set of regressions broken up by the various categories or component parts of the pooled regression.

   b) Application of the Chow Test confirms Mr. Kaplan's study involving disaggregated regressions, (*see* II.B.2). It is inappropriate for Dr. Beyer to "pool" all the customer data together into a single regression. Instead, each customer's pricing experience should be estimated separately.

C. Dr. Beyer's regression is unreliable even on its own terms as a means of estimating a general "industry-wide" overcharge in either the Tin Stabilizers or ESBO markets. (See Mr. Kaplan's Direct Examination and Cross-Examination.)

   1. Reasonable changes to Dr. Beyer's model input lead to drastic changes in results. Reliable models are not sensitive to reasonable changes.

   2. The ESBO market changed after the Arkema Blooming Prairie plant explosion. The Chow Test demonstrates that, in the ESBO regression, it was inappropriate to "pool" sales transaction data from before the explosion with sales transaction data from after the explosion. Therefore, the model should be estimated separately for the periods before and after the explosion.

a) Dr. Beyer admitted that the Blooming Prairie explosion is the type of "a priori" economic reason that justifies running the Chow Test. But Dr. Beyer refused to run the Chow Test to investigate if the data should be pooled.

> (1) Dr. Beyer also claimed that he accounted for the effects of the explosion by using a "dummy variable" in his regression. But that approach assumes that the explosion had no effect whatsoever after May 1, 1997, only four months after the explosion.

b) When Dr. Beyer's regression is run separately for the period after the explosion, it produces a *"negative and significant"* (no overcharge) estimate of the effect on prices from the alleged conspiracy.

c) The fact that the model produces radically different results when run for a significant portion of the time period modeled in Dr. Beyer's regression indicates that Dr. Beyer's model is not reliable and is overly sensitive to reasonable alternative specifications. It is not well specified.

3. Replacing or modifying the data Dr. Beyer uses in his tins regression to estimate prices (the "explanatory variables") with what are, at the very least, equally reasonable alternative data (other "explanatory variables") leads to significant changes in results. Reliable regressions are not this sensitive to reasonable alternatives.

a) Dr. Beyer's use of housing starts as a measure of demand for tin stabilizers inadequately represents the complete set of demand factors. And Dr. Beyer's alternative use of the "construction put in place" data is equally unreliable as a measure of demand because it is measured in nominal dollars (reflecting inflation) and includes irrelevant factors. When these errors are corrected and the Federal Reserve Board's Construction Supplies Index is used in Dr. Beyer's model, the model no longer estimates an "industry-wide overcharge" for the alleged conspiracy period.

b) Dr. Beyer failed to account for a delay, or lag, between changes in cost and changes in price even though the evidence indicates such a delay or lag. When Dr. Beyer accounted, in part, for a lag, his estimate of the "industry-wide" effect of the alleged conspiracy fell significantly. And when Mr. Kaplan fully accounted for the lag, together with a more accurate demand index, the model estimated that prices were significantly *lower* during the conspiracy period, after controlling for other factors.

4. Mr. Kaplan identified other market realities ignored by Dr. Beyer's tin regression.

a) Dr. Beyer's tin regression uses a single cost measure, even though reverse esters and TGA products require significantly different raw materials for production. This leads to Dr. Beyer's cost measure being wrong 100 percent of the time.

b) Dr. Beyer ignores Arkema's introduction of substantial new methyltin capacity in 2000, which had far-reaching effects on market price.

3

III. **"Price Increase Announcements," "List Prices" and Related Anecdotal Evidence Present in Documents and Testimony Are Not Capable of Proving Impact for Every Class Member.**

A. Dr. Beyer's "effectiveness" analysis is limited to reciting isolated statements in company documents and witness testimony without meaningful further investigation.

    1. Dr. Beyer relies solely on incomplete evidence: anecdotal accounts present in scattered documents and testimony. That evidence alone, without any attempt to test if it comports with actual prices paid, is incapable of proving impact on each and every class member.

    2. Dr. Beyer admits that his casual "effectiveness" analysis has been superseded by his regression analysis, which he characterizes as the "most comprehensive" analysis of the effectiveness of the announcements. (Tr. June 28, 2010 AM Session at 85:21-23.)

B. Price increase announcements were, at best, aspirational. No inference can be drawn from their existence that every class member would have been affected by a conspiracy. (See Dr. Beyer's Cross-Examination, Mr. Kaplan's Direct Examination, and Video Deposition of Mr. Bole.)

    1. Not one of the price increase "ranges" includes all defendants.

    2. The announcements were frequently rescinded and implemented inconsistently, if at all.

    3. Price increase announcements were sometimes a ploy, or "head fake" for one defendant to gain a competitive opportunity at a customer.

    4. To determine the effect on any customer's price requires examination of the actual prices paid by the customer and the surrounding circumstances.

C. "List prices" bore little to no relationship to prices actually paid by proposed class members.

    1. Arkema, a large producer of both tins and ESBO, did not maintain "list prices." (*See* Dr. Beyer's Direct Examination.)

    2. The transaction data shows that any standard "list prices" do not reflect the reality of prices paid by any class member. The prices paid by class members moved in different directions over time. (*See* Mr. Kaplan's Report and Testimony.)

IV. **Dr. Beyer's "Pricing Structure" Analysis is Not Capable of Proving Impact for Every Class Member**

A. Dr. Beyer's "Pricing Structure" analysis is inherently subjective and unreliable. It is based solely on Dr. Beyer's "visual observation" of lines on a chart and his subjective judgment as to whether the lines "move similarly." Because it is subjective, it cannot be duplicated or tested for similar results by various investigators, and is therefore unreliable.

B.  Dr. Beyer's "Pricing Structure" analysis is incomplete and lacks class-wide scope.

   1. Dr. Beyer subjectively limited his analysis to select customers and products.

   2. Mr. Kaplan's rebuttal pricing charts showed that prices for other selected customers did not "move similarly" under any conceivable standard.

C.  Dr. Beyer's "Pricing Structure" analysis uses averages that mask variation.

D.  Dr. Beyer admits the limited utility of his "Pricing Structure" analysis.

   1. The "Pricing Structure" analysis is limited to showing the relationship between price and one variable, time. Regression analysis is better suited to controlling for myriad factors and evaluating any "similarity" of price trends across customers.

   2. Dr. Beyer retreats to his position that his "Pricing Structure" analysis is "confirmatory" and not "necessary" to his analysis.

**V. Generally described "characteristics" of the tins and ESBO industries are not capable of proving that every class member was injured by the alleged conspiracy.**

   A. Dr. Beyer identified a series of broadly described market characteristics for both the tins and ESBO markets that he claims support an inference that every member of the class would have been affected by the alleged conspiracy; but there is no empirical evidence to support this argument and, in fact, the empirical evidence refutes it.

   B. Many tin products are varied and not substitutable across different producers. (See Dr. Summers's Direct Examination.)

   1. There is no dispute that *some* tins products offered by a defendant may compete directly against other products manufactured by another defendant.

   2. There are many important distinctions between products in their formulation and performance—even those products that one defendant might consider to be in "competition" with another product. Purchasers (guided by technical experts) select the product that will perform best in their application; often that will require qualification. Price is not always the driving factor.

   3. Each of the producers was not able to produce all tins products.

   C. There is ample record evidence of customers individually negotiating competitive prices with the defendants by leveraging the availability of product from other defendants and non-defendant suppliers, and defendants responding by cutting prices to meet competition. (See Mr. Kaplan's Direct Examination and Cross-Examination.)

**VI. Conclusion: The evidence proffered by Plaintiffs is not common evidence capable of proving that every class member would have been affected by the alleged conspiracy.**

5

# CERTIFICATE OF SERVICE

## 2:03-cv-02038-LDD (Direct Purchaser Class Action)

I hereby certify that on July 2, 2010 , I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

STEVEN E. BIZAR
steven.bizar@bipc.com

ANTHONY J. BOLOGNESE
abolognese@bolognese-law.com

NATHANAEL M. COUSINS
nat.cousins@usdoj.gov,marc.siegel@usdoj.gov

CHARLES ANDREW DIRKSEN
cdirksen@gbcslaw.com
efilingnotices@gbcslaw.com
cdl@gbcslaw.com

NATHAN P. EIMER
neimer@eimerstahl.com
fharvey@eimerstahl.com
abrown@eimerstahl.com

CARL N. FRANKOVITCH
carln@facslaw.com

JOHN G. HARKINS , JR
jharkins@harkinscunningham.com
mstrohmeyer@harkinscunningham.com

CRAIG W. HILLWIG
chillwig@kohnswift.com
info@kohnswift.com
cspagna@kohnswift.com

WILLIAM E. HOESE
whoese@kohnswift.com
jburt@kohnswift.com

LANDON Y. JONES
landon.jones@bipc.com

ROBERT N. KAPLAN
rkaplan@kaplanfox.com

COLIN R. KASS
ckass@kirkland.com

RICHARD J. KILSHEIMER
rkilsheimer@kaplanfox.com

JOSEPH C. KOHN
jkohn@kohnswift.com

WAYNE A. MACK
wamack@duanemorris.com

THOMAS P. MANNING
manningtp@bipc.com

THOMAS J. MCGARRIGLE
tmcgarrigle@reedsmith.com,rreber@reedsmith.com

DIANNE M. NAST
dnast@rodanast.com

STEIG D. OLSON
solson@cmht.com

J. MANLY PARKS
jmparks@duanemorris.com

WILLIAM H. ROBERTS
roberts@blankrome.com

**JAMES J. RODGERS**
jrodgers@dilworthlaw.com

**JILL ROGERS SPIKER**
jill.spiker@bipc.com

**HOWARD D. SCHER**
scherhd@bipc.com,howard.scher@bipc.com

**STEVEN O. SIDENER**
ssidener@gbcslaw.com,cgw@gbcslaw.com

**COLLEEN HEALY SIMPSON**
csimpson@harkinscunningham.com
mstrohmeyer@harkinscunningham.com

**SCOTT C. SOLBERG**
ssolberg@eimerstahl.com
fharvey@eimerstahl.com
abrown@eimerstahl.com

**JOHN K. THEIS**
jtheis@eimerstahl.com

**PATRICK A. TILLOU**
ptillou@cohenmilstein.com,awentworth@cohenmilstein.com,efilings@cohenmilstein.com

**A. PAUL VICTOR**
pvictor@deweyballantine.com

**JASON A. ZWEIG**
jzweig@kaplanfox.com

I further certify that I have mailed, by U.S. Postal Service, the foregoing to the following non-CM/ECF participants:

**GREGORY K. ARENSON**
KAPLAN FOX & KILSHEIMER LLP
850 THIRD AVE., 14TH FL
NEW YORK, NY 10022

**PATRICK M. BRYAN**
**TEFFT W. SMITH**
**REBECCA A. KOCH**
KIRKLAND & ELLIS, LLP
655 - 15TH ST., N.W. 12TH FL.
WASHINGTON, DC 20005

**STANLEY M. CHESLEY**
WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A.
FOURTH & VINE STREETS
CENTRAL TRUST TOWER, SUITE 1513
CINCINNATI, OH 45202

**MARK LEDDY**
CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP
2000 PENNSYLVANIA AVE, N.W.
SUITE 9000
WASHINGTON, DC 20006-1801

**SCOTT MARTIN**
WEIL, GOTSHAL & MANGES, LLP
767 FIFTH AVENU
NEW YORK, NY 10153-0119

s/ Howard D. Scher